# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

THAO RIM,                                         )
                                                  )
    Plaintiff,                )
                                                  )
v.                                                )          **Case No. 3:18-cv-00911**
                                                  )          **Judge Aleta A. Trauger**
LABORATORY MANAGEMENT                             )
CONSULTANTS, INC.,                                )
                                                  )
    Defendant.                )

## MEMORANDUM

Before the court is the Motion for Summary Judgment (Doc. No. 26) filed by defendant

Laboratory Management Consultants, Inc. ("LMC"), seeking dismissal of plaintiff Thao Rim's

claims of discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964,

42 U.S.C. § 2000e *et seq.*, as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e-

2(a)(1). For the reasons set forth herein, the Motion for Summary Judgment will be granted.

## I.      MATERIAL FACTS[1] and PROCEDURAL BACKGROUND

Defendant LMC is a small business engaged in providing "installation, inspection,

accreditation, and oversight services" for laboratories. (Compl., Doc. No. 1 ¶¶ 22, 23.) It is

owned by Eddie Davidson. LMC's headquarters are in Hazard, Kentucky ("Hazard Office"), but

it operates a small office, formerly a house, in Madison, Tennessee ("Nashville Office").

Davidson also owns other companies, including MD Analysis, one of LMC's clients. Davidson

---

[1] The facts stated herein are drawn from the plaintiff's Response to the Defendant's
Statement of Undisputed Material Facts (Doc. No. 31-12), the defendant's Response to
Plaintiff's Statement of Additional Material Facts (Doc. No. 35), the pleadings, and the
evidentiary materials submitted by both parties in support of their respective positions. Unless
otherwise indicated, the facts are undisputed.

and LMC employees Angela Koontz (Office Manager), Lori Pigman (Assistant), Brad Howard (Technical Consultant), and John Adkins (Technical Consultant) worked primarily out of the Hazard Office.

Rim was hired by LMC on October 16, 2017 as a Certifying Scientist to work from the Nashville Office. Only three other people besides Rim worked primarily out of the Nashville Office while Rim was there: Charles Champion, Michael Twilbeck, and, for a short period of time, Doretha Hammonds.[2] As a Certifying Scientist, Rim's job was to review data obtained from a client laboratory and to certify that the specimen analyzed, whether blood or urine, tested positive or negative for a specific drug or high or low for a specific substance. In this position, Rim was expected to produce accurate patient data and lab results.

Rim informed LMC that she was pregnant by sending an email "somewhere probably the end of October" 2017, shortly after she was hired. (Rim Dep. 78–79.) Rim never heard anyone at LMC make negative comments about her pregnancy. (Rim Dep. 81.) Koontz, in fact, congratulated her. (*Id.*; *see also* Koontz Dep., Doc. No. 26-3, at 119.)

The plaintiff testified that, when she was hired, Davidson told her that she would be permitted to work remotely and that she would not be required to come into the office during specific hours. (Rim Dep., Doc. No. 26-1, at 11.) She also alleges that Davidson told her that she would be traveling much of the time. (Rim Dep. 13.) According to Rim, Davidson told her she would be travelling to visit the clients she was assigned, learn their equipment and instruments, and facilitate in consulting and trouble-shooting when issues emerged. (Rim Dep. 13.) Davidson, on the other hand, testified that he did not expect Rim to travel, because she "did not have the educational requirements or experience to go out and deal with client[s] in the field." (Davidson

---

[2] Jeremy Johnson was first interviewed on April 10, 2018 but did not begin working for LMC until some time after the plaintiff was terminated. (Rim Dep. 171–72; Davidson Dep. 149.)

Dep., Doc. No. 26-2, at 153.) It is undisputed that Rim's office mates, Twilbeck and Champion, traveled a lot for work and that Rim did not. She traveled to the Hazard Office once to interview for the job and a second time "a few months after she was hired" for training on a particular instrument. (Koontz Dep., Doc. No. 26-3, at 61;[3] Rim Dep. 45.)

LMC agrees that, during the first several months of the plaintiff's employment, all employees were permitted to work a flexible work schedule. (Doc. No. 26-3, at 68.) On January 5, 2018, Rim received an email from Angie Koontz, LMC's Office Administrator, informing her that, beginning on Monday, January 8, 2018, she would be required to be in the office from 9:30 to 3:30 daily. (Doc. No. 31-2, at 1.) The email, which was directed to Rim, did not state that Champion and Twilbeck would also be required to be in the office during specific hours. (*Id.*) However, while Champion and Twilbeck, like the plaintiff, were Certifying Scientists, they also had the experience and credentialing to travel to client sites and consult on methodology. (Davidson Dep., Doc. No. 26-2, at 134–38.) The plaintiff did not have the experience or credentials to serve as a consultant, and her job duties did not require travel.[4] (Davidson Dep. at 113–14.)

Koontz testified that, as a result of receiving multiple reports from clients that work was not being completed in a timely manner and that clients were unable to get in touch with anyone in the Nashville office, LMC implemented a new policy in January 2018, requiring employees to be in the office during certain hours when they were not traveling for work. (Doc. No. 26-3, at 124, 167; Davidson Dep. 44.) As the plaintiff points out, the only email in the record announcing

---

[3] Koontz's deposition transcript contains three different forms of pagination that are not consistent with each other—two inserted by the court reporter and one by the court's electronic docketing system. The court will use the CM/ECF pagination when referring to that transcript.

[4] The plaintiff purports to dispute this statement in her Response to the Defendant's Statement of Undisputed Material Facts, but her response is not supported by any citation to the record. (Doc. No. 31-12 ¶ 7.)

this new policy required the plaintiff to be in the office during certain hours. It did not apply to Twilbeck or Champion. (Doc. No. 31-2, at 1.) The email also notified Rim that she would be required to email a daily task list at the start of each day and an update at the end of the day. (*Id.*) According to Koontz, Twilbeck and Champion spent a substantial amount of time traveling, but they, too, were supposed to be in the office when they were not traveling. (Doc. No. 26-3, at 122.) The plaintiff has no evidence to refute this statement, but neither has LMC produced documentation supporting it.

The plaintiff denies that she received actual training, other than on-the-job training, when she began working at LMC. She characterized the training as a process of "trial and error," which involved Michael Twilbeck's showing her the differences between the processes at the clinic where she had worked previously and those used at LMC. (Rim Dep. 28 ("[H]e was showing me the difference between how . . . LMC worked and the difference with the clinics that I worked prior.").) After about a month of his explaining things to her, she felt able to do everything on her own, but he continued to help her with her results throughout her tenure at LMC. (Rim Dep. 28–29.) According to Davidson, Rim spent "months supposedly training under Michael Twilbeck and Charles Champion," reading data, before she was allowed to certify data on her own. (Davidson Dep. 111–13.)[5] Rim was released to certify data independently beginning in or around January 2018.[6]

After the plaintiff was released to certify data in January up until her termination in May

---

[5] The plaintiff disputes this assertion in her response to the defendant's Statement of Undisputed Material Facts, but her record citation does not support her assertion that "there were no secondary reads." (Doc. No. 31-12 ¶ 16.)

[6] The defendant's Statement of Undisputed Material Facts actually states that the date was January 201**9**, which the plaintiff does not dispute. (Doc. No. 31-12 ¶ 18.) Based on the context and the fact that the plaintiff's employment was terminated in 2018, the court presumes that the parties intended to say January 201**8**.

2018, she repeatedly misread lab results. (Davidson Dep. at 100–01; Rim Dep. 85–137.)[7] The record is replete with evidence of the plaintiff's errors, including emails documenting at least a dozen instances in which the plaintiff's work had to be reviewed and resubmitted from January through April 2018. (Rim Dep. Exs. 4, 5, 7–16, Doc. No. 26-1, at 249–51, 253–70.) The plaintiff offers no evidence that any other employee had an error rate approaching hers.

On April 10, 2018, shortly after Rim requested information concerning LMC's maternity leave policy, LMC implemented an employee handbook that contained various policies and procedures, including a provision for six weeks of paid maternity leave. (*See* LMC Employee Handbook, Rim Dep. Ex. 2, Doc. No. 26-1, at 195–247.) The plaintiff received a copy of the handbook on April 10, 2018. (Doc. No. 26-1, at 248.) Rim met with Angie Koontz and John Adkins that day to go over the handbook and for the purpose of discussing her mistakes and the importance of accuracy for patient care. (Koontz Decl., Doc. No. 26-4 ¶ 3 and attached memo., Doc. No. 26-4, at 3; *see also* Rim Dep. at 123–26 (acknowledging that she talked to Adkins and Koontz about the misreads during the April 10, 2018 meeting and about whether she needed additional training).)[8] The plaintiff admitted to rushing through her work and assured Koontz and Adkins that she could do the job and did not need any additional training. (Koontz Decl., Doc. No. 26-4 ¶ 3 and attached memo., Doc. No. 26-4, at 3; Rim Dep. at 125–26.)

Rim testified that, by the time the handbook was implemented, she believed that the

---

[7] The plaintiff "dispute[s]" this assertion (Doc. No. 31-12 ¶ 21) but without explanation or further elaboration, other than by record citations. These citations (to Rim's deposition testimony and to exhibits to Davidson's and Koontz's depositions) do not substantiate her position. The evidence submitted by both parties clearly supports the defendant's assertion that Rim made numerous mistakes in her job, even if she believes many of the mistakes were understandable and should have been excused.

[8] The plaintiff disputes this assertion without explanation. (Doc. No. 31-12 ¶ 22.) Her citations to her own deposition testimony and the exhibits to Davidson's and Koontz's depositions do not support her position.

company was "already trying to fire [her]." (Rim Dep. 166.) When asked why, she stated: "Because of just the way I was treated, the way I was talked to." (*Id.*) She talked to Twilbeck and Champion about it and repeatedly asked Twilbeck if the company was trying to replace her, particularly after she learned that the company had announced that it was looking to hire someone for her "same position." (*Id.*) Twilbeck responded, "Not that I know of yet, but we will keep you updated." (*Id.*)

Following the April 10, 2018 meeting, Rim continued to make errors reading lab results. (Rim Dep. 116–19, 122–23, 133–35; Rim Dep. Ex. 15, Doc. No. 26-1, at 268–69; Koontz Dep. Ex. 13, Doc. No. 26-3, at 183.) On April 20, 2018, LMC issued plaintiff a written Progressive Discipline Warning ("written discipline"). It appears that the written discipline initially referenced errors that had been reported to Koontz on April 19 and April 20, 2018. The original form is not in the record, but when the plaintiff received an email from Koontz notifying her of the written discipline, the plaintiff responded that "the mis-reads that are being fixed," apparently referencing reads for LMC's client, MD Analysis, "were prior to [the] conversation on 4/10/18," and that the plaintiff did not perform any work for MD Analysis between April 10 and April 20, 2018. (*See* Doc. No. 26-1, at 276 (April 20, 2018 email from Rim to Koontz responding to email from Koontz titled "Written Warning").) In other words, the plaintiff objected to receiving a written discipline related to events that took place before implementation of the employee handbook. Koontz responded to the plaintiff's email, stating: "You are absolutely correct for MD Analysis and I have taken that off of the warning form." (*Id.* at 275 (April 24, 2018 email from Koontz to Rim).)

The written discipline that is actually in the record pertains only to four reads the plaintiff had performed for a different client, Central States, and indicates that, upon recheck, it was

confirmed that the plaintiff had "misread 3 of the [4] reads." (Doc. No. 26-1, at 273.) The plaintiff responded to the written discipline by stating that there were actually only two misreads, out of the four, not three. (Doc. No. 26-1, at 275.) Rim claims that, after receiving the written discipline, she told Champion and Twilbeck, "I told you, they're going to find ways to write me up at least three times to fire me." (Rim Dep. 166.)

The plaintiff complains that she was asked to cover reads for Central States, a laboratory ordinarily assigned to Twilbeck, while Twilbeck was on vacation. At the meeting with Koontz and Adkins on April 10, she stated that she was comfortable reading lab reports and did not need additional training. (Rim Dep. 125.) It was not until she began to have more misreads and received the written discipline pertaining to misreads for Central States that she clarified to Koontz that, while she was comfortable with her own labs, she was not comfortable reading other employees' results for other clients. (Rim Dep. 125; *see also* Rim Dep. Ex. 19, Doc. No. 26-1, at 276 ("As for picking up Michael and Charles' labs, some may have different Methods and looks to their chromatography and I am not fully comfortable with that. I know we are required to pick up each others' labs due to traveling and vacations, but Mike and Charles are a lot better at reads than I am, and I am trying to learn as much as I can still from them.").)

On April 24, 2018, Michael Twilbeck counseled plaintiff about her misreads and other issues. (Koontz Dep. Ex. 13, M. Twilbeck email to Koontz, Doc. No. 26-3, at 183.) Twilbeck recommended that the plaintiff slow down even further to ensure her work was accurate, and he notified her that she should not upload any results going forward until someone had reviewed her work for accuracy. (*Id.*)

On April 30, John Adkins sent an email to Rim, Twilbeck, and Champion, copied to Koontz and Davidson, stating that it was "concerning misreads and the process we need to do

moving forward to . . . prevent the misreads." (Doc. No. 26-1, at 272.) The solution from that date would be to have Twilbeck or Champion do secondary reads of all of Rim's reads before they were uploaded to the client portal. (*See id.* ("Thao do not release any results until Michael or Charles have performed the secondary read and considered acceptable. We will do this until further notice. We are only trying to help eliminate as many misreads as possible.").) Twilbeck replied, "[w]ill do," and Rim responded simply, "I understand." (Doc. No. 26-1, at 271.)

Toward the end of either March or April, 2018,[9] the plaintiff erroneously uploaded a file for one LMC client into the account for a different LMC client. (Rim Dep. at 148.) She realized her error almost immediately and went to Michael Twilbeck for advice on how to correct it. (Rim Dep. at 149.) He explained what she should do, and she believed that she had followed his instructions and corrected the error. (Rim Dep. 149–51.) She did not know differently until a few days later, when Angie Koontz called and asked her to explain what had happened. (Rim Dep. 153.)

The mistake was brought to the attention of Eddie Davidson around May 1, 2018, when he received an angry phone call from a client informing him that patient lab results were missing. (Koontz Decl. ¶ 3 and attachment.)[10] Rim was suspended pending an investigation and was informed that this incident could ultimately lead to her termination. (Koontz Dep., Doc. No. 26-3, at 151; *id.* Ex. 12, Doc. No. 26-3, at 182.)[11] After the investigation concluded, LMC

---

[9] The defendant's Statement of Undisputed Material Fact says March 29, 2018 (Doc. No. 31-12 ¶ 28), referencing an email from Michael Twilbeck to Koontz (Doc. No. 26-3, at 183). Other evidence in the record, including the plaintiff's complaint to the Tennessee Human Rights Commission and the defendant's interrogatory answers, suggests that the incident occurred in late April 2018. (Doc. No. 26-1, at 295; Doc. No. 31-9, at 3.)

[10] The plaintiff states that she "disputes" this assertion, without reference to any citation to the record.

[11] Without citation to the record, Rim disputes that there was an investigation, because "[n]o one spoke with Twilbeck until after the decision to terminate had been made." (Doc. No.

determined that Rim had made a critical error. It terminated her employment effective May 4, 2018. (Rim Dep. Ex. 20, Doc. No. 26-1, at 277; Koontz Dep. Ex. 15.) The written form documenting her termination explained as follows:

> You uploaded a file that you had mislabeled to Paracelsus [the technology company that supported LMC's client accounts] in the Greenwood Account. You called and spoke with Paracelsus and had them to delete the upload but the upload had accession numbers that was [sic] close to the accession numbers that had previously been uploaded to Paracelsus and the results overrode those results that was currently in Paracelsus and when you had the results deleted it deleted the results that had previously been uploaded to Paracelsus and the client called Eddie [Davidson] and was very upset because the patients [sic] was at the clinic and when the provider looked for the results they were gone. This was a very dangerous mistake because it did endanger the patient's treatment.

> When we called Paracelsus to confirm the mistake they did confirm that you had called and had those results deleted.

(Rim Dep. Ex. 20, Doc. No. 26-1, at 277.)

After Rim's termination, Twilbeck received notification from an LMC client who was upset about additional misreads from a set of results the plaintiff had read prior to her termination. (Koontz Dep. Ex. 13, Doc. No. 26-3, at 183.) According to Davidson, misreads that he attributed to Rim caused the company to lose a client even before the employee handbook was implemented and before Rim was terminated. (Davidson Dep., Doc. No. 26-2, at 213–14.)

Rim characterized her termination as retaliation. (Rim Dep. 166.) However, she concedes that she never informed anyone at the company that she believed she was being disciplined or treated differently because of her pregnancy. (Rim Dep. 164–65.) When asked, "what were they retaliating against you for," Rim responded "[p]retty much just a way to terminate me for making

---

31-12 ¶ 32.) The record does include an email from Twilbeck to Koontz dated May 11, 2018, after Rim's termination, that Twilbeck's recollection was that he had spoken with Thao about the Paracelsus issue on March 29, and, on March 30, Paracelsus deleted those samples from the client's software. According to Twilbeck, Thao never uploaded the correct samples. Twilbeck was notified on April 23 that "the batch [had] still never been uploaded," so Twilbeck uploaded them. (Doc. No. 26-3, at 183.)

a mistake that . . . [Twilbeck] made as well." (Rim Dep. 167.) There is no evidence, however, that the company was aware that Twilbeck, as the plaintiff claims, had made the same mistake she had made, other than by her telling Koontz either when she was suspended or when she was terminated. (Rim Dep. 165 ("Whoever called me to suspend me that day, . . . I told them [Twilbeck] did the same thing as well, because he was the one who guided me how to fix it."); *see also* Koontz Dep. Ex. 14, Doc. No. 26-2, at 184 ("Informed Thao of her termination. . . . I asked her if she had any questions and she said NO. I asked her again and she said yes, she wasn't sure why she was getting fired because [Twilbeck] had told her he had done this before and he knew how to fix it.").)

The plaintiff includes numerous other "facts" in her Statement of Additional Material Facts. To the extent that the facts are not supported by a citation to the record, the court disregards them. Many of the other facts include a reference to the record that does not actually support it; most of the facts appear not to be material. Regardless, to the extent the plaintiff's additional facts are supported by the record and appear to have at least minimal relevance, the court summarizes them here:

LMC's Certifying Scientists perform their work remotely by using several electronic systems, of which Paracelsus is one. The test data is uploaded to Paracelsus by Certifying Scientists, and LMC clients then download test data from Paracelsus. The laboratories and the doctors' offices LMC worked with used Liquid Chromatography Mass Spectrometry to dilute the urine or saliva being analyzed and then pushed the substance through an instrument; this process is less expensive and faster than Solid Phase Extraction.

While the plaintiff worked at LMC, she was primarily assigned to do work for three specific clinics: Tisdall, Greenwood, and MD Analysis. At some point in early 2018, MD

Analysis, a clinic owned by Davidson, changed the solution used for dilution of its samples from methanol to acetonitrile. (Rim Dep. 30, 34, 36.) Rim claims this change caused her significant difficulties in performing the reads for MD Analysis. (Rim Dep. 31.) She appears to blame most of her errors on MD Analysis's change in procedure.

Rim claims that Davidson or his assistant would respond promptly to emails from Twilbeck and Champion but not to her emails, and, when they did respond, they would do so through Twilbeck rather than directly to her. (Rim Dep. 56–57.) Her belief was based on conversations with Twilbeck and Champion. (Rim Dep. 57–58.) She agreed that she did not know for sure that Davidson or his assistant always responded promptly to emails from Twilbeck and Champion.

The plaintiff claims as an example of disparate treatment an instance when the internet at the Nashville office was down, and Champion was permitted to work from home while Rim was required to report to the office and "stay there until the cable guy came and fixed it." (Rim Dep. 59.) She claims that the cable guy never showed up, and she eventually had to go home and do her actual work from home, causing her to work more hours than the others. (Rim Dep. 62.) Rim also claims she was assigned more work at that time, because she had three clinics while Champion only had one. (Rim Dep. 60.)

The plaintiff filed a Discrimination Complaint with the Tennessee Human Rights Commission on May 9, 2018, just days after her termination, asserting that she had been discriminated against because of her pregnancy. (Doc. No. 26-1, at 295.) The EEOC issued a Dismissal and Notice of Rights on June 26, 2018. (Doc. No. 1-3.) The plaintiff filed this lawsuit on September 24, 2018, asserting claims for discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, as amended by the

Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e-2(a)(1).[12]

The defendant filed its Motion for Summary Judgment (Doc. No. 26) on September 3, 2019, seeking dismissal of Rim's claims for discrimination and retaliation in connection with her pregnancy. The plaintiff filed a Response to Motion for Summary Judgment (Doc. No. 31), asserting that material factual disputes make summary judgment inappropriate. In its Reply (Doc. No. 34), LMC argues that the plaintiff has failed to address the deficiencies addressed in the defendant's summary judgment motion and has failed to establish the basic elements of her Title VII and PDA claims.

## II.    LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Trans. Co.*,

---

[12] The Complaint also purports to "seek[] redress . . . *for the intentional infliction of emotional distress*." (Doc. No. 1, at 1.) It does not, however, set forth a separate cause of action for intentional infliction of emotional distress or allege facts that would support a claim of intentional infliction of emotional distress under Tennessee law. The court, therefore, construes the Complaint as asserting a claim for emotional distress damages in connection with the defendant's alleged violation of Title VII and the PDA.

446 F.3d 637, 640 (6th Cir. 2006). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.

The court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id.* The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

## III.   ANALYSIS

### A.   *Discrimination Claim*

The Pregnancy Discrimination Act ("PDA") expressly extends Title VII's prohibition against sex discrimination to discrimination based on pregnancy. It provides, in relevant part:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall

be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise.

42 U.S.C. § 2000e(k). Where PDA claims are not premised upon direct evidence of discriminatory animus, the Sixth Circuit employs "the familiar *McDonnell Douglas* burden-shifting framework to analyze Title VII pregnancy discrimination cases." *Asmo v. Keane, Inc.*, 471 F.3d 588, 592 (6th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Thus, "[t]o sustain her claims, as a threshold matter," the plaintiff must first establish a *prima facie* case of discrimination. *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 573 (6th Cir. 2006).

To state a *prima facie* case of pregnancy discrimination, the plaintiff must show that "(1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Id.* at 573 (citation omitted). The *prima facie* requirement for making a Title VII claim "is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The *prima facie* phase "merely serves to raise a rebuttable presumption of discrimination by 'eliminat[ing] the most common nondiscriminatory reasons for the [employer's treatment of the plaintiff].'" *Hollins v. Atl. Co.*, 188 F.3d 652, 659 (6th Cir. 1999) (quoting *Burdine*, 450 U.S. at 253–54), *abrogated in part by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

If a plaintiff successfully establishes her *prima facie* case of pregnancy discrimination, the burden of production shifts to the defendant to articulate a legitimate nondiscriminatory reason for its actions. *Tysinger*, 463 F.3d at 576. If the defendant cannot meet this burden, the plaintiff prevails. *Id.* If it satisfies this burden, "then the presumption of intentional

discrimination arising from the *prima facie* case is negated, making it incumbent on the plaintiff to rebut the articulated reason by showing that it is not credible and is a mere pretext for discrimination." *Id.*

### 1.        The Plaintiff's Prima Facie *Case*

There is no dispute that the plaintiff was pregnant and that she suffered an adverse employment action when her employment was terminated. She therefore meets the first and third elements of her *prima facie* case. LMC argues that the plaintiff cannot meet the second and fourth elements and that the only adverse employment action she suffered, for purposes of the third element, was her termination.

Regarding the second element, the plaintiff does not even address the defendant's assertion that she has failed to show that she is qualified for her job, but the defendant erroneously focuses its argument on the same elements that, it claims, supply the legitimate, non-discriminatory reasons for the plaintiff's discipline and termination. (*See* Doc. No. 27, at 9 (referencing Rim's "extensive history of . . . consistently failing to produce accurate lab results").) The Supreme Court and the Sixth Circuit have both made it clear that, "when assessing whether a plaintiff has met her employer's legitimate expectations at the *prima facie* stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660–61 (6th Cir. 2000). "To assess this evidence at the *prima facie* stage is to misapply legal rules governing the allocation of burdens and order of proof to the determination of 'the ultimate question.'" *Id.* at 662 (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)). In light of the facts that (1) Rim was deemed qualified when she was hired and (2) LMC does not address her qualifications independently of

the non-discriminatory reasons for her termination, the court finds that there is at least a material factual dispute as to whether she was qualified for her job.

Regarding the third element, it is undisputed that the plaintiff's termination qualifies as an adverse employment action. Rim also insists, however, that other events qualified as adverse employment actions, including (1) LMC's revocation of its policy of allowing employees to work a flexible schedule and to work remotely, or "telework," and, in its place, requiring Rim (and only Rim) to report to the office daily between the hours of 9:30 and 3:30; (2) requiring daily emails to detail what she was working on; and (3) issuing the written discipline for misreads. (Doc. No. 31, at 2, 4.)

The Sixth Circuit defines an adverse employment action in the discrimination context as "a materially adverse change in the terms of [a person's] employment." *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 797 (6th Cir. 2004) (en banc) (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996)), *aff'd with modifications sub nom. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

> [A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Hollins*, 188 F.3d at 662. That is, there must be "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). "Employment actions that are *de minimis* are not materially adverse and are not actionable under Title VII." *Wills v. Pennyrile Rural Elec. Co-op. Corp.*, 259 F. App'x 780, 783 (6th Cir. 2008) (citing *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000)).

It does not appear that any of the events to which Rim points, other than her termination, rises above the *de minimis* level. In this case, the plaintiff complains that she was no longer permitted to work from home and instead was required to report to an office for a minimum of six hours a day. The court recognizes that removing or diminishing an employee's privilege of working from home "reduces the overall benefits of one's employment." *Harrison v. Proctor & Gamble Distrib., LLC*, 290 F. Supp. 3d 723, 736 (S.D. Ohio 2017), *appeal dismissed per stipulation*, No. 17-4298, 2018 WL 3031459 (6th Cir. Mar. 23, 2018). It is not, however, a *material* change. *See id.*; *accord Stone v. La. Dep't of Revenue*, No. 12-3022, 2016 WL 3746199, at *8 (E.D. La. July 13, 2016) (finding that being transferred to different office where the plaintiff was allowed to telecommute only one day a week instead of three was not a materially adverse employment action, and noting that "numerous federal courts have held that denying an employee's request to telecommute is not an adverse employment action for purpose of Title VII"), *aff'd*, 707 F. App'x 216 (5th Cir. 2017); *Allbritain v. Tex. Dep't of Ins.*, No. A-12-CA-431-SS, 2014 WL 272223, at *4 (W.D. Tex. Jan. 23, 2014) ("Federal courts have repeatedly held denying an employee's request to telecommute is not an 'adverse employment action' for the purpose of Title VII." (citations omitted)); *Lewis v. CareCore Nat'l LLC*, No. 11-CV-00204-RBJ-KLM, 2012 WL 3704985, at *9 (D. Colo. May 30, 2012) ("Even if Plaintiff was inconvenienced by having to commute to work as opposed to telecommute from home, a mere inconvenience is not an adverse employment action." (internal quotation marks and citation omitted), *report & recommendation adopted*, No. 11-CV-00204-RBJ-KLM, 2012 WL 3705081 (D. Colo. Aug. 24, 2012); *Homburg v. United Parcel Serv., Inc.*, No. 05-2144-KHV, 2006 WL 2092457, at *9 (D. Kan. July 27, 2006) (finding that withdrawal of permission to work from home was a mere inconvenience rather than an adverse employment action), *amended*, No.

CIV.A. 05-2144-KHV, 2006 WL 2251031 (D. Kan. Aug. 1, 2006); *Haas v. Zurich N. Am.*, No. 05 C 1421, 2006 WL 2849699, at *4 (N.D. Ill. Sep. 29, 2006) ("The fact that [plaintiff's supervisor] did not permit [plaintiff] to work from home every time she requested is also not an adverse employment action.").

In this case, Rim has not offered evidence of the length of her commute, argued that being required to commute daily into the office rather than working from home posed a significant burden on her or materially extended her daily work schedule, or shown that the conditions at the Nashville Office were objectively intolerable. *See Deleon v. Kalamazoo Cty. Rd. Comm'n*, 739 F.3d 914, 919 (6th Cir. 2014) (noting that a transfer might qualify as an adverse employment action, but only if the plaintiff shows, "[a]t a minimum, . . . a quantitative or qualitative change in the terms of the conditions of employment").[13] Moreover, the fact that she was only required to be in the office six hours a day suggests that she continued to enjoy substantial flexibility in scheduling the other hours of her workday. The plaintiff has not shown that being required to be in the office more frequently, and the consequent diminishment in the flexibility of her working hours, was a materially adverse change in the terms and conditions of her employment. *Accord Kocsis*, 97 F.3d at 885 (reaffirming that "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims"). Rather, these changes amounted to minor inconveniences rather than adverse employment actions. *See id.* ("[A] change in employment conditions must be more disruptive than a mere inconvenience.").

---

[13] In *Deleon*, the plaintiff avoided summary judgment because he offered evidence that the work station to which he was transferred was objectively intolerable: it was "an office and enclosed garage facility with running trucks and equipment that resulted in constant exposure to diesel fumes," described by another employee as "a stinky environment. It's like sticking your head in an exhaust pipe. Have you ever sat in traffic behind a city bus? That's what it was like . . . ." 739 F.3d at 916–17.

Likewise, Rim has not shown that the requirement that she submit daily emails detailing both her agenda for the day and what she had accomplished at the end of each day was a materially adverse action. Typically, an alteration of job responsibilities does not constitute an adverse employment action unless there is evidence that the employee received "a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010) (citations omitted). The plaintiff here does not contend that drafting and submitting these emails took up a substantial amount of time or extended her workday significantly. Nor was the requirement accompanied by a change in title, diminished responsibilities, or any other indicator suggesting that it was an adverse employment action. Again, this requirement amounted, at most, to a minor inconvenience. *See id.* ("A 'bruised ego' or a 'mere inconvenience or an alteration of job responsibilities' is not sufficient to constitute an adverse employment action." (citation omitted)).

The counseling that the plaintiff received on April 10 and the increased scrutiny of her work before that also did not qualify as adverse employment actions. In the discrimination context, the Sixth Circuit has "rejected the rule that only 'ultimate employment decisions,' such as hirings, firings, promotions, and demotions, can be materially adverse for the purpose of a Title VII . . . discrimination claim." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594 (6th Cir. 2007) (quoting *White*, 364 F.3d at 801). Nonetheless, such things as contentious oral confrontations, "stern words," and even negative performance evaluations do not constitute adverse employment action, unless they have an adverse impact on an employee's wages or salary. *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007); *see also White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008) ("Thus, to characterize a negative

performance evaluation as an adverse employment action the plaintiff must point to a tangible employment action that she alleges she suffered, or is in jeopardy of suffering, because of the downgraded evaluation." (internal quotation marks and citation omitted)).

The written discipline presents a closer question. Generally speaking, "increased surveillance and discipline, whether warranted or not, do not constitute a material adverse change in the terms of employment in the discrimination context because those actions do not 'constitute[] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Lee v. Cleveland Clinic Found.*, 676 F. App'x 488, 494 (6th Cir. 2017) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d at 402); *see also Swann v. Time Warner Entm't Co.*, 126 F. Supp. 3d 973, 983 (S.D. Ohio 2015) ("[W]ritten discipline and negative performance reviews do not amount to adverse employment actions where unaccompanied by a materially adverse change in the terms and conditions of a plaintiff's employment."). However, where the discipline involves suspension from work for several days or suspension without pay, it may constitute an adverse employment action. *Rose v. Buckeye Telesystem, Inc.*, 181 F. Supp. 2d 772, 776 (N.D. Ohio 2001) (citations omitted). Rim was not suspended, must less without pay, in connection with the written discipline.

Rim suggests that the discipline was an adverse employment action because it effectively placed her on probation and under the threat of termination, since the written discipline itself noted that it was one of three allowed "strikes" before termination would be considered. (*See* Doc. No. 26-1, at 273 ("Unless this problem is corrected, further <u>disciplinary action</u> will be taken up to and including termination of your employment.").) The Sixth Circuit does not appear to have addressed the question of whether being placed on probation, standing alone, is an adverse

employment action in the context of a discrimination claim, but it has "held that placement on a performance improvement plan and non-satisfactory work reviews, absent some loss in salary, title, or benefits, did not rise to the level of a materially adverse employment action." *Amos v. McNairy Cty.*, 622 F. App'x 529, 534 n.3 (6th Cir. 2015) (citation omitted). Although it has held that a probationary period may be an adverse employment action if it affects an employee's future prospects for promotion or a raise, it has required actual "evidence to support any such possibility" that the disciplinary action affected the employees "prospects for advancement." *Lahar v. Oakland Cty.*, 304 F. App'x 354, 357 (6th Cir. 2008). Rim does not offer any such evidence in this case. Moreover, even though the written discipline indicates that Rim could be terminated upon three disciplinary actions, the Sixth Circuit has determined that holding an employee to a higher level of scrutiny following a disciplinary reprimand does not on its own affect an employee's employment in a sufficiently material way to be deemed an adverse employment action. *Birch v. Cuyahoga Cty. Probate Court*, 392 F.3d 151, 169 (6th Cir. 2004); *see also Saulsberry v. FedEx Exp.*, No. 2:11-CV-02581-AJT, 2013 WL 596061, at *6 (W.D. Tenn. Jan. 15, 2013), *report & recommendation adopted*, No. 11-02581, 2013 WL 594735 (W.D. Tenn. Feb. 14, 2013), *aff'd sub nom. Saulsberry v. Fed. Exp. Corp.*, 552 F. App'x 424 (6th Cir. 2014). The court finds, under the circumstances presented here, that the plaintiff's written discipline was not an adverse employment action. However, as discussed below, even assuming that it was, the plaintiff cannot show the requisite causal nexus between her pregnancy and that event or that LMC's reasons for the written discipline are pretext.

Regarding the causal nexus element of the plaintiff's *prima facie* case, the only evidence of causality to which the plaintiff points is temporal proximity. The Sixth Circuit has recognized that temporal proximity may "satisfy the nexus requirement in the pregnancy discrimination

context." *Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006). In cases in which the temporal proximity is "acutely near in time," temporal proximity alone may constitute circumstantial evidence of a causal connection. *Id.* at 593, 594 (citing *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004)). In *Asmo*, the defendant made the decision to terminate the plaintiff within two months of learning that she was pregnant with twins. *Id.* at 594. The court found that this very close temporal relationship was "sufficient to establish a link between Asmo's pregnancy and her termination for purposes of a *prima facie* case." *Id.* (citing *DiCarlo*, 358 F.3d at 422 (twenty-one days); *DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 393 (6th Cir. 2005) (approximately two months)).[14]

The Sixth Circuit has also indicated, in the context of a pregnancy discrimination case, that, where the time period between the employer's knowledge of any employee's pregnancy and the adverse action is greater than five months, that temporal relationship, standing alone, is not sufficiently close to permit an inference of a causal connection between them. *Kubik v. Cent. Mich. Univ. Bd. of Trustees*, 717 F. App'x 577, 581 (6th Cir. 2017). While that distance "does

---

[14] Some Sixth Circuit cases have suggested that "[c]loseness in time is one indicator of a causal connection, but temporal proximity, standing alone, is not enough to establish a causal connection for a retaliation claim." *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010). In *Mickey v. Zeidler Tool & Die Co.*, the Sixth Circuit attempted to resolve any confusion on this issue, expressly stating that,

> [w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

516 F.3d 516, 525 (6th Cir. 2008). As one district court has observed, while there remains some confusion on this topic, "the most recent Sixth Circuit panels to have considered the issues have analyzed the issue of causal connection consistent with the court's holding in *Mickey*." *Clark v. Shop24 Glob., LLC*, 77 F. Supp. 3d 660, 684 n.9 (S.D. Ohio 2015) (citations omitted).

not . . . preclude[] relief," "additional evidence must be offered." *Id.* The plaintiff points out that, in *Kubik*, the adverse employment action took place more than five months after the plaintiff gave birth, whereas all the actions that took place in this case occurred while the plaintiff was still pregnant. (Doc. No. 31, at 6–7.) In other words, she seems to be suggesting that the date on which the defendant learned of her pregnancy is not the relevant date. "[T]ypically, however, courts calculate temporal proximity for these purposes based the amount of time 'between the employer's learning of an employee's pregnancy and an adverse employment action taken with respect to that employee.'" *Bonner-Gibson v. Genesis Eng'g Grp.*, No. 3:18-cv-00298, 2019 WL 3818872, at *9 (M.D. Tenn. Aug. 14, 2019) (quoting *Asmo*, 471 F.3d at 594; citing *DeBoer*, 124 F. App'x at 391 (discussing temporal proximity relative to the employee's "announcement of her pregnancy")).[15] In this case, more than five months passed between the time the plaintiff notified LMC that she was pregnant and the dates LMC implemented the disciplinary policy and issued the written discipline; more than seven months passed between the time the plaintiff notified LMC that she was pregnant and her termination. The length of time between the employer's knowledge of Rim's pregnancy and these actions, standing alone, is not sufficient to give rise to the inference of a nexus between the events. The plaintiff must present additional evidence.

Here, the plaintiff articulates the correct legal standards and references the relevant case law, but she makes no effort to show a causal nexus between her termination and her pregnancy, other than by implicitly acknowledging that she must present other evidence, in addition to

---

[15] In *Bonner-Gibson*, this court recognized that "the PDA's 'protection extends to the whole range of matters concerning the childbearing process,'" as a result of which "[t]he date on which the pregnancy was announced, therefore, might not be the only important date for temporal proximity purposes." 2019 WL 3818872, at *9 (quoting *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 469–70 (6th Cir. 2005). The facts here are distinguishable from those in *Bonner-Gibson*, however, and the court finds no reason to focus on any other date in this case.

temporal proximity, to establish the fourth element of her *prima facie* case. Instead, she jumps directly to the question of pretext. (*See* Doc. No. 31, at 6–7.)

Nonetheless, giving the plaintiff the benefit of the doubt and construing the facts as well as her arguments in the light most favorable to her as the non-moving party, the court understands the plaintiff to be arguing that other circumstantial evidence in the record, including the other events she characterizes as adverse employment actions, constitutes the "additional evidence" required by *Kubik* to establish a causal connection between her pregnancy and her termination. However, the court need not address the question of whether the plaintiff has established a causal nexus through this indirect route, because the court finds, as discussed below, that the plaintiff has failed to establish that LMC's proffered reasons for its actions are pretext for discrimination.

2. *LMC's Proffered Legitimate, Non-Discriminatory Reasons for its Actions*

Even assuming that all of the events the plaintiff characterizes as adverse employment actions actually qualify as such, LMC has offered legitimate, non-discriminatory reasons for each of them. It states that the requirement that Rim report to the office daily was implemented because the company perceived a need to have someone in the office more frequently to answer client telephone calls and generally man the office. (Davidson Dep. 142.) While LMC maintains that Champion and Twilbeck were also required to be in the office daily when they were not traveling, the burden of being in the office fell more on Rim, because Twilbeck and Champion justifiably traveled more than she did. LMC states that it implemented the requirement that Rim send daily emails to document what she had on her agenda each day and what she had accomplished at the end of each day arose because Rim was not completing work in a timely fashion. (Koontz Dep. 67.) Regarding the written discipline, suspension, and termination, the defendant points to the plaintiff's history, dating at least from early January, of poor job

performance, beginning with repeated errors in reading lab results and culminating in her uploading information for one client to another client's portal and then failing to ensure that the error was corrected appropriately.

Requiring an employee's presence in the office in order to meet the employer's business needs is a legitimate, non-discriminatory reason for revoking a telecommuting policy. *Accord Homburg*, 2006 WL 2092457, at *11 (finding that an employer's revocation of an employee's permission to work from home after the employer received a complaint was not pretextual). Moreover, it is well established that a plaintiff's "increasingly poor job performance" may constitute a legitimate, non-discriminatory reason for an adverse employment action. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1116 (6th Cir. 2001); *see also Todd v. RBS Citizens, N.A.*, 483 F. App'x 76, 82 (6th Cir. 2012) ("Poor job performance is of course a legitimate rationale for adverse employment actions."); *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 502 (6th Cir. 2007) ("Plaintiff concedes that, if true, poor performance is a legitimate, non-discriminatory reason for his termination."). Certainly, the plaintiff's poor performance constituted a legitimate, non-discriminatory reason for LMC's increased oversight, the written discipline, suspension, and termination.

### 3. *Evidence of Pretext*

Because LMC has successfully rebutted the presumption of discrimination created by the plaintiff's *prima facie* case by proffering a legitimate, nondiscriminatory reason for each of its decisions, the burden shifts back to Rim to show that LMC's proffered reasons are pretextual. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). A plaintiff can demonstrate pretext by showing that the proffered reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Id.* The ultimate burden of proof to show discrimination remains on the plaintiff. *Id.* "The three-part

test need not be applied rigidly. Rather, '[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)).

"[T]o survive summary judgment, a plaintiff need only produce enough evidence . . . to rebut, but not to disprove, the defendant's proffered rationale." *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012) (citation omitted). The Sixth Circuit has recognized that, once the employer has proffered a non-discriminatory explanation for its action, the plaintiff "d[oes] not need to produce additional evidence to support a finding of pretext; the evidence that he produce[s] in support of his *prima facie* case may, but will not necessarily, suffice to show a genuine issue of material fact concerning pretext." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 532, 533 (6th Cir. 2007), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

The plaintiff here does not claim that the proffered reasons have no basis in fact or that they were not sufficient to warrant the defendant's actions. Instead, she appears to be trying to show that they did not actually motivate the defendant's actions, by arguing that "circumstantial evidence . . . creates a triable issue concerning the employer's discriminatory intent." (Doc. No. 31, at 8.) To establish pretext through this route, the plaintiff must show that "the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Abdulnour*, 502 F.3d at 503 (6th Cir. 2007) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)); *see also Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013) ("A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities,

inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason.").

The circumstantial evidence the plaintiff claims supports a finding of pretext includes: (1) the temporal proximity between the plaintiff's announcement of her pregnancy and the changes in the telecommute policy and flexibility in hours and the refusal to allow her to travel, particularly because these changes did not apply to the men with whom she worked; (2) LMC's "resist[ance to] discovery necessary for comparator analysis" and insistence that, because Rim was the only Certifying Scientist at the Nashville Office, she had no meaningful comparators; (3) the defendant's failure to offer more training and the lack of evidence that it "bent over backwards to help Plaintiff improve" (Doc. No. 31, at 9), as it claims; (4) the implementation of the disciplinary policy and the issuance of the written discipline shortly after the plaintiff requested information about the company's maternity leave policy on April 5, 2018; (5) the company's serving the written discipline on the plaintiff the same day it delivered the employee handbook containing the maternity policy and the same day Davidson was interviewing Jeremy Johnson for a Certifying Scientist position at the Nashville Office (Doc. No. 31, at 13); (6) LMC's initial attempt to discipline the plaintiff for misreads that took place before the disciplinary policy was issued; (7) the plaintiff's salary being $7,000 less than Jeremy Johnson's when he was hired; (8) Davidson's silence about the plaintiff's pregnancy; (9) LMC's blaming her for a mistake that she had tried to correct by following Twilbeck's instructions, suggesting that the ultimate error (deleting patient information) was actually Paracelsus's fault rather than the plaintiff's; and (10) LMC's failure to discipline Michael Twilbeck for making the same type of uploading error.

These events, considered singly or in the aggregate, simply are not sufficient to make it "more likely than not" that LMC's explanation is a pretext. *Abdulnour*, 502 F.3d at 503. Much of the evidence to which the plaintiff points is the same evidence she claims supports her *prima facie* case, which the court does not find to be particularly strong to begin with. And much of it is simply irrelevant or misstated. First, regarding the temporal proximity between the plaintiff's announcement of her pregnancy and the changes in the telecommute policy and flexibility in hours and the refusal to allow her to travel, as discussed above, these events do not constitute adverse employment actions. Even if they did, the Sixth Circuit has recognized in the retaliation context that "mere temporal proximity" between the protected activity and the adverse employment action "will rarely be sufficient in and of itself to create a triable issue," *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008), particularly where the defendant has proffered a legitimate, non-discriminatory reason for those actions. The plaintiff implies that she was treated differently from similarly situated male employees, which, she claims, creates an inference of discrimination. The male employees to which she compares herself are not truly comparable, however. She admits that they had much greater experience and expertise than she did, and it is not disputed that they traveled frequently for their jobs. They also did not require the oversight that she did. Under the circumstances, the policy change does not suggest discrimination.

The defendant's alleged resistance to discovery related to the other employees is immaterial. The plaintiff brought a discovery dispute regarding this issue to the court's attention; the court conducted a conference call with the parties and agreed with the plaintiff that she was entitled to the discovery she sought. The parties indicated at that point that they could reach an agreement, and no further court intervention was sought by either party. The plaintiff cannot now

argue that she did not receive necessary discovery, and a discovery dispute that occurred well after the events giving rise to the plaintiff's lawsuit simply has no relevance to the pretext question under the circumstances presented here. Moreover, the plaintiff has not shown that the other employees, Twilbeck and Champion, were truly comparable to her, other than by arguing that their job titles were the same as hers.

The question of whether the record supports the defendant's claim that it "bent over backwards to help Plaintiff improve" (Doc. No. 31, at 9) is somewhat equivocal, simply because the question of what it means to "bend over backwards" in this context is ambiguous. In any event, the defendant's characterization of the extra training at the Hazard Office as special training to benefit the plaintiff appears, at best, to be an exaggeration. The evidence indicates that the training was specifically for the purpose of teaching employees to use a new piece of equipment and was offered by the company that sold the equipment to LMC as part of the price of the device. However, the plaintiff does not dispute that she received months of on-the-job training and assistance from Michael Twilbeck. In addition, LMC offered her additional training during the April 10 meeting, which the plaintiff refused. Regardless of whether there is a factual dispute about how much training the plaintiff received, the question of whether LMC bent over backwards to help the plaintiff to improve begs the question of whether it had any obligation to do so in the first place. The plaintiff was apparently hired with the expectation that she already had the experience and much of the necessary training to perform her job satisfactorily. The plaintiff has not suggested that training was offered to non-pregnant employees but not to her, and the defendant tolerated the plaintiff's repeated mistakes for over six months before taking any disciplinary action. Again, the failure to provide more training does not create an inference of discrimination.

The question of travel is another red herring. First, contrary to her assertion, the plaintiff did travel after she informed the company of her pregnancy: she reported that she was pregnant in late October, and she traveled to the Hazard Office for the equipment training at some point during the Spring of 2018. Second, even if the plaintiff had a legitimate expectation that she would be traveling more for her job, she has not shown that the lack of travel was in any way related to her pregnancy as opposed to her qualifications or job performance. And, because the plaintiff never actually traveled regularly for her job, the lack of travel did not amount to a "change" in the terms and conditions of her employment. In other words, there was no "policy change" relating to the plaintiff's traveling for the job, and the lack of travel does not create an inference of discrimination either.

The plaintiff claims that the close proximity in time between the date she pushed for information regarding the company's maternity leave policy and the creation and implementation of the disciplinary policy is circumstantial evidence of discriminatory intent. However, (1) the company already knew she was pregnant by that time; (2) the handbook answered her questions, establishing a fairly liberal maternity leave policy (six weeks of paid leave); and (3) it was not inherently unreasonable for the company also to implement a formal disciplinary policy at the same time as it established a formal maternity leave policy, particularly in light of the fact that the pregnant employee was the one having job performance problems.[16]

The timing of the issuance of the written discipline does not suggest a nefarious motive either. The plaintiff claims that she was issued a written warning the same day the employee handbooks were distributed. The evidence actually shows that the handbooks were distributed on

---

[16] The defendant does not present any evidence regarding how long it took to create the employee handbook, but it seems likely that its creation took more than five days. That is, the handbook was likely in the works before the plaintiff sent her email asking about the maternity leave policy on April 5.

April 10, 2018, the same day the plaintiff met with Koontz and Adkins for verbal counseling about her repeated misreads. She did not receive the written discipline until April 20, and it related to errors that took place around April 19. The evidence suggests that, when the written discipline was initially issued, it contained reference to some misreads for MD Analysis that Rim completed before the dissemination of the handbook and implementation of the disciplinary policy on April 10. The plaintiff brought this fact to Koontz's attention. (*See* Doc. No. 26-1, at 276 (April 20, 2018 email from Rim to Koontz responding to email from Koontz titled "Written Warning").) Koontz responded to the plaintiff's email, stating: "You are absolutely correct for MD Analysis and I have taken that off of the warning form." (*Id.* at 275 (April 24, 2018 email from Koontz to Rim).) The misreads that remained on the written discipline concerned a different client, Central States. The plaintiff responded to the revised written discipline by arguing that, of the three reported misreads for Central States (out of four reads), one was actually correct, as confirmed on review. She did not then, and does not now, dispute that two of the four reads were incorrect. In other words, the evidence is clear that the plaintiff continued to make errors following the issuance of the employee handbook, after going over the disciplinary policy contained in it with Koontz and Adkins, and after receiving verbal counseling from Koontz about slowing down and being more careful. That fact fully justified the issuance of the written discipline and does not suggest discrimination.

That Jeremy Johnson was interviewed on April 10, the same day the plaintiff received the handbook and was counseled, suggests only that LMC was hiring, not that it was actively seeking to replace Rim. The plaintiff herself conceded that the company had experienced an increase in business beginning in January 2018, and Davidson testified that he hired Johnson because he was seeking to grow the company. (Davidson Dep. 234.) The fact that Johnson's

starting annual salary was $7,000 higher than Rim's is likewise immaterial. The plaintiff offers no evidence that she and Johnson were comparable in terms of training and experience. Moreover, her salary was offered at the time she was hired, before anyone knew she was pregnant, and she has not stated a claim of gender discrimination based on her salary.[17]

Citing *Asmo v. Keane, Inc.*, 471 F.3d 588 (6th Cir. 2006), Rim next contends that Davidson's silence about her pregnancy gives rise to an inference of discriminatory animus, particularly when coupled with LMC's failure to discuss with her how her work load would be handled during her maternity leave. In *Asmo*, the plaintiff announced her pregnancy during a conference call with her entire team and her supervisor. Everyone on the telephone call congratulated her except for her supervisor, who remained conspicuously silent and "then tried to quickly change the conversation back to business matters." *Id.* at 591. The court found that the supervisor's silence in that context, particularly in light of the fact that the plaintiff was pregnant with twins, was "suspect." *Id.* at 594. Thereafter, the supervisor never mentioned the plaintiff's pregnancy, even though he conducted weekly conference calls with the plaintiff's team and her job involved a considerable amount of travel. "Given the combination of Asmo's job's being particularly demanding of time due to travel and her announcement of not just a pregnancy, but a pregnancy of twins, Santoro's silence could be interpreted as discriminatory animus." *Id.* at 595. The same circumstances are not present here. The plaintiff barely had any direct contact with

---

[17] The parties dispute whether Johnson was hired as a Technical Supervisor or Certifying Scientist, but that dispute is not material. Without any citation to the record, Rim claims that LMC's only stated reason for paying Johnson more money was because he had a master's degree and then implies that this a lie because Johnson does not, in fact, have a master's degree. (Doc. No. 31, at 16–17.) This issue was discussed in Davidson's deposition, where Davidson acknowledged that he was mistaken about the master's degree but stated that he had a good faith belief that Johnson had a master's degree. (Davidson Dep. 168–69.) Davidson also explained that, even without the advanced degree, Johnson had significant experience as a certifying scientist and was qualified to serve as a technical supervisor. (Davidson Dep. 169–70, 234–35.)

Davidson, who was based in Kentucky, and there is no evidence that she announced her pregnancy to him face-to-face or by phone, nor is there an email in the record showing she emailed him the news directly.[18] The situation here is more similar to that of *Megivern v. Glacier Hills Inc.*, 519 F. App'x 385, 399 (6th Cir. 2013) (Table), where the plaintiff "never had a face-to-face meeting or phone conversation" with the supervisor who made the decision to terminate the plaintiff's employment, "thus making *Asmo* distinguishable." Davidson's silence here is not circumstantial evidence of discriminatory animus.

The plaintiff's contention that the error that led to her firing was potentially Paracelsus's fault rather than her own is not material. Regardless of whether Paracelsus may have also made an error that compounded, rather than cured, the plaintiff's initial error, there is no dispute that she did, in fact, commit a serious error and that her attempt to cure it was not fully effective. Moreover, there is no dispute that Davidson believed that her error caused the client to become upset. "If the employer had an honest belief in the proffered basis for the adverse employment action, and that belief arose from reasonable reliance on the particularized facts before the employer when it made the decision, the asserted reason will not be deemed pretextual even if it was erroneous." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 586 (6th Cir. 2009) (citations omitted).

Finally, regarding the plaintiff's claim that Michael Twilbeck had previously made the same mistake but was never disciplined, suggesting disparate treatment, there is no evidence that anyone but Twilbeck himself ever knew he had made the error, until he told the plaintiff and she

---

[18] The plaintiff did send an email to Koontz and to Lori Pigman on April 5, 2018, copied to Davidson, Twilbeck, and Champion, giving notice of her due date and asking again about the company's maternity leave policy. (Doc. No. 31-7.) It does not appear that Davidson responded directly to this email, but, less than a week later, the company formally implemented the policy granting six weeks of paid maternity leave.

brought it to Koontz's attention, either on the day she was suspended or the day she was actually terminated. That is, if Twilbeck did make the error, he corrected it without repercussion. There is no evidence that he made an error that was brought to Davidson's attention by an angry client. Thus, there is simply no comparison between the plaintiff's admitted error and Twilbeck's purported error.

As indicated above, "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Chen*, 580 F.3d at 400 n.4. In light of the overwhelming evidence of repeated errors by the plaintiff and her employer's increasing unhappiness with her performance, the purported circumstantial evidence to which the plaintiff points, even viewed in the light most favorable to the plaintiff, does not give rise to a reasonable inference that the defendant was motivated by discriminatory intent or that the proffered reasons for its actions were pretextual. The defendant is entitled to summary judgment in its favor on the plaintiff's discrimination claim under the PDA.

### B.    *Retaliation Claim*

To make a *prima facie* showing of Title VII retaliation, an employee must show that (1) she engaged in activity protected by Title VII; (2) the defendant knew of her exercise of her protected rights; (3) the defendant subsequently took an action that was "materially adverse" to the plaintiff; and (4) the protected conduct was a but-for cause of the adverse action. *Goodsite v. Norfolk S. Ry. Co.*, 573 F. App'x 572, 582 (6th Cir. 2014) (citing *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (modifying the third element to require a "materially adverse action" rather than an "adverse employment action"); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) ("The text, structure, and history of Title VII demonstrate that a plaintiff making a

retaliation claim under § 2000e–3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.").

If the employee makes this showing, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. If the employer meets this burden, the employee must demonstrate that the legitimate reason offered by the employer was a "pretext designed to mask retaliation." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008).

The defendant argues that Rim's retaliation claim fails because she does not allege that she engaged in protected activity or that the decision makers were aware that she had engaged in any protected activity. (Doc. No. 27, at 16–19.) In response, the plaintiff insists that she "engaged in protected activity by informing Defendant of pregnancy, by requesting information related to maternity leave, [and by] opposing changes made to her employment but not" to her colleagues' terms of employment. (Doc. No. 31, at 2.)

Title VII protects employees from retaliation for having opposed an employer's unlawful actions. 42 U.S.C. § 2000e–3(a). "An employee has engaged in opposing activity when she complains about unlawful practices to a manager, the union, or other employees." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (citation omitted). Thus, to engage in "protected activity" for purposes of a Title VII (or PDA) retaliation claim, the plaintiff must actually complain to someone that her employer is violating Title VII and show that her employer knows about her complaints.

Rim claims that she engaged in protected activity when she reported her pregnancy and requested information relating to maternity leave. These acts were not "protected activity" for purposes of a Title VII retaliation claim, because they did not constitute a complaint that the

employer was violating Title VII. *Accord Hudspeth v. City of Dallas*, No. 3:16-CV-02664-N, 2017 WL 10126216, at *2 (N.D. Tex. Feb. 17, 2017) (dismissing retaliation claim for failure to state a *prima facie* case, because "[t]aking pregnancy leave is not a protected activity under Title VII"); *Ramjit v. Benco Dental Supply Co.*, No. 6:12-CV-528-ORL-28, 2012 WL 3024437, at *2 (M.D. Fla. July 24, 2012) (dismissing retaliation claim on the grounds that "'[u]tilizing pregnancy benefits' does not constitute making a charge, testifying, assisting, or participating in an investigation, proceeding, or hearing, nor does it amount to opposing an unlawful employment practice"); *Madoffe v. Safelite Sols., LLC*, No. 2:06-CV-771, 2008 WL 2531450, at *3 (S.D. Ohio June 24, 2008) ("Courts have held pregnancy itself is not a protected activity to support a retaliation claim." (collecting cases)).

The plaintiff also claims that she engaged in protected activity when she opposed changes made to the terms of her employment. She testified in her deposition, however, that, prior to her termination, she never told anyone that she believed she was being treated differently than male employees because of her sex or pregnancy, because she did not think it was "appropriate" to do so. (Rim Dep. 163, 164, 165.) In other words, although Rim may have believed that she was being discriminated against based on her gender or pregnancy, and she may have complained generally about her treatment, there is no evidence in the record that she ever made any kind of complaint, formal or informal, that she was being unlawfully discriminated against.

Because Rim has not shown that she engaged in activity protected by Title VII, she cannot establish that she suffered retaliation because of such activity, and her retaliation claim fails as a matter of law. The court will grant LMC's motion for summary judgment on the plaintiff's Title VII retaliation claim.

## IV.    CONCLUSION

For the reasons set forth herein, the defendant's Motion for Summary Judgment will be

granted, and the plaintiff's claims under the PDA and Title VII will be dismissed. An appropriate order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge